## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Harley Automotive Group, Inc., | Civil No. 12-1110 (DWF/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM**<br>**OPINION AND ORDER** |
| AP Supply, Inc., Nicholas<br>Gary Anderson, Erik J. Mortimer,<br>Craig Andrew Passeretti, | |
| Defendants. | |

---

Ansis V. Viksnins, Esq., and Carrie Ryan Gallia, Esq., Lindquist & Vennum PLLP, counsel for Plaintiff.

Joseph T. Dixon, Jr., Esq., and John N. Bisanz, Jr., Esq., Henson & Efron, PA, counsel for Defendants.

---

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by

Defendants AP Supply, Inc. ("AP Supply"), Nicholas Gary Anderson ("Anderson"),

Erik J. Mortimer ("Mortimer"), and Craig Andrew Passeretti ("Passeretti") (together,

"Defendants") (Doc. No. 36).[1]  For the reasons discussed below, the Court grants in part

and denies in part the motion.

---

[1]     The Court refers to Anderson, Mortimer, and Passeretti, together, as the "Individual Defendants."

# BACKGROUND

## I.      The Parties

Plaintiff Harley Automotive Group, Inc. ("Harley") sells wholesale automotive

parts and supplies via telephone to motor vehicle dealerships across North America.

(Doc. No. 1, Compl. ¶ 9.)  Harley has approximately eighty employees and facilities in

Oakdale, Minnesota, and Fort Myers, Florida.  (*Id*. ¶ 9; Doc. No. 43, Doc. No. 39, Bisanz

Aff. ¶ 2, Ex. A ("Harley Dep.") at 7-13.)  Jim Harley is the owner of Harley.  (Harley

Dep. at 5-6.)

Defendants Anderson, Mortimer, and Passeretti all worked at Harley as sales

representatives before they left to work at AP Supply.  (Bisanz Aff. ¶ 3, Ex. B ("AP

Supply Dep.") at 14.)[2]  AP Supply was originally incorporated in North Dakota in

February 2010, and was later converted into a Wisconsin corporation.  (AP Supply Dep.

at 12-13.)  AP Supply, like Harley, uses telemarketing to wholesale automotive parts to

dealerships in the United States.

## II.     Harley's Business

Harley maintains a database of customer information on its computer system.

(Bisanz Aff. ¶ 5, Ex. D ("Bongiovanni Dep.") at 23-27; Doc. No. 42, Bongiovanni Decl.

¶ 4.)  Part of the database includes a compilation of dealership names, addresses,

telephone numbers, and the names of contacts at each dealership.  (Bongiovanni Decl.

---

[2]      Anderson and Passeretti are the owners of AP Supply and Mortimer is an
employee.

¶ 5.)  The database contains information for current and past Harley customers, including approximately 5,000 active customers in the United States.  (Bongiovanni Dep. 23-24.)

Harley sells auto parts under several different names or affiliated entities, such as American Parts Warehouse, Advanced Automotive Industries, American Auto Parts, Pro-Source Abrasives, and Captiva Automotive.  (Harley Dep. at 8-14.)  Most of Harley's various entities operate out of the same facility and use the same product list. (*Id*.)

Harley identifies potential customers by purchasing lists from a provider called InfoUSA and then makes cold-calls from that list.  (Bongiovanni Dep. at 11.)  InfoUSA allows its clients to narrow the list of potential customers by using a Standard Industrial Classification ("SIC") code that limits a list to certain types of businesses.  (*Id*. at 13-15.) Harley purchases a list from InfoUSA every couple of years in order to keep the list current and identify new potential customers.  (*Id*. at 15-16.)  The lists from InfoUSA include information about businesses such as the company's name, address, and phone number.  (*Id*.)  Harley asserts that its customer database also contains some information that is not available from InfoUSA, such as updated contact information, the names of individual contacts, or personal information about buyers.  (Harley Dep. at 24-25; Steiner Dep. at 30-31, 39; Bongiovanni Decl. ¶ 7.)

After logging in with a username and password, Harley's sales representatives have access to Harley's parts list and a portion of the customer database containing the sales accounts assigned to them.  (Bongiovanni Dep. at 97-101.)  Customer information is not labeled "confidential."  (*Id*. at 27.)

### III.     Individual Defendants' Employment with Harley

Anderson began working for Harley as a sales representative in January 1995. (Bisanz Aff. ¶ 8, Ex. G ("Anderson Dep.") at 21.)  Passeretti was a Harley employee from 1998 through 2004.  (Bisanz Aff. ¶ 9, Ex. H ("Passeretti Dep.") at 11.)  In 2004, Passeretti claims he was let go from Harley, and in January 1995, Passeretti started a wholesaling business with another former Harley sales representative, and later worked for a third company telemarketing automotive parts.  (*Id.* at 23, 28-31.)  Passeretti returned to Harley as a sales representative in April 2007.  (Bisanz Aff. ¶ 11, Ex. J.) Mortimer began working for Harley as a sales representative in December 2006.  (Bisanz Aff. ¶ 12, Ex. K.)

Anderson, Passeretti, and Mortimer all signed employment agreements with Harley (the "Employment Agreement(s)").  (Bisanz Aff. ¶¶ 10, 11, 12, Exs. I, J, K.)[3]  The relevant sections of the respective agreements provide as follows:

> SECTION 7.          PROHIBITION ON DISCLOSURE OF
>                             INFORMATION.
>
>         Employer has invested time and money in developing and refining
> its customer lists, business practices and procedures and has thereby
> obtained a decisive competitive advantage over other automobile parts
> business in the area.  Employee shall not at any time during his/her
> employment under this Agreement, except in the normal course of
> Employer's business, or after termination of  that employment, disclose to
> any person or organization information regarding Employer's customers, or
> the procedures and systems utilized by Employer to service Employer's

---

[3]     While not identical, the respective Employment Agreements are similar in all relevant respects.  The Court cites to the Employment Agreement between Harley and Passeretti as a representative example of the agreements at issue in this action.

customers which the Employee acquired knowledge of during his/her employment with Employer.

Section 8.     RESTRICTIVE COVENANT.

Employee hereby acknowledges that he/she has had either no previous training or experience or limited training and experience as an auto parts Sales Representative and that Employer will expend its resources in training and assisting Employee in developing skills as a Sales Representative.  Employee also acknowledges that were he/she to undertake employment with one of Employer's competitors, Employer would suffer a substantial loss of its investment and be put at an unfair competitive disadvantage.

For a period of twelve (12) months following the termination of Employee's employment hereunder, Employee shall not, either directly or indirectly, solicit the sale of, arrange for the distribution of, sell, or distribute automobile parts from a location within a 300 mile radius of either [Harley's Oakdale, Minnesota, or Ft. Myers, Florida, locations].

For a period of twelve (12) months following the termination of Employee's employment hereunder, Employee shall not accept employment with any other person or entity engaged in the business of selling or distributing automotive parts within a 300 mile radius of either [Harley's Oakdale, Minnesota or Ft. Myers, Florida locations], nor shall Employee hold any ownership interest in any entity engaged in the business of selling or distributing automotive parts located within a 300 mile radius of either [Harley's Oakdale, Minnesota or Ft. Myers, Florida locations].

SECTION 9.          SURRENDER OF RECORDS AND PROPERTY.

Upon termination of his/her employment with Employer, Employee shall deliver promptly to Employer all records, manuals, books, blank forms, documents, letters, memoranda, notebooks, notes, reports, data, tables, calculations or copies thereof, which are the property of the Employer or which relate in any way to the business, products, practices or techniques of the Employer.

(Bisanz Aff. ¶ 11, Ex. J ("Employment Agreement").)

## IV.  Big Rig Supply

In December 2009, Anderson and Passeretti incorporated C&N Supply, Inc. (d/b/a "Big Rig Supply").  (AP Supply Dep. at 15, 19.)  Big Rig Supply's principal place of business was in Lindstrom, Minnesota.  (*Id.* at 23.)  Big Rig Supply was in the business of wholesale telemarketing that sold exclusively to heavy truck dealers.  (*Id.* at 19-22.) Anderson and Passeretti generated a customer list for Big Rig Supply by running internet searches for "heavy truck dealerships" on www.google.com and www.yellowpages.com. (*Id.* at 30-31.)  In addition, Passeretti used a resource through the Ramsey County Public Library called ReferenceUSA, which allowed Passeretti to search for truck dealerships by using a SIC code to narrow his search to truck dealerships.  (*Id*. at 32-33.)  Passeretti was able to download and print information about hundreds of heavy truck dealerships.  (*Id.* at 34.)  Passeretti and others then taped this information to note cards for reference.  (*Id.* at 34-35.)  The note cards contained dealership names, addresses, and phone numbers. (*Id.* at 36.)  Big Rig Supply closed in January 2010.  (*Id.* at 25.)  Passeretti and Anderson were both employees at Harley during the time they operated Big Rig Supply and had each been working at Big Rig Supply for about 20 hours per month.  (*Id.* at 29.)

## V.     AP Supply

On February 3, 2010, Passeretti and Anderson both terminated their employment with Harley.  (Doc. No. 43, Gallia Decl. ¶¶ 15, 16, Exs. N, O.)  Mortimer terminated his employment with Harley in March 2010.  (Bisanz Aff. ¶ 4, Ex. C ("Mortimer Dep.") at 18-19.)

On February 4, 2010, Passeretti and Anderson opened AP Supply.  (Anderson Dep. at 27.)  AP Supply was originally located in Jamestown, North Dakota.  (AP Supply

Dep. at 16.)  Both Anderson and Passeretti commuted to Jamestown, North Dakota, from

Minnesota every Monday and returned to Minnesota on Thursday evenings.  (*Id*.

at 60-61.)

AP Supply claims that it began soliciting customers by using information from

ReferenceUSA.  (*Id*. at 45-46, 73-74; Anderson Dep. at 61.)  Anderson and Passeretti

also began calling businesses to which they had sold parts prior to starting AP Supply.

(Anderson Dep. at 131; Passeretti Dep. at 63.)  The businesses that Anderson and

Passeretti called included dealerships to which they had sold to while working at Harley.

(Anderson Dep. at 131; Passeretti Dep. at 63-64.)  Anderson and Passeretti claim that

they recalled the businesses by memory.  (*Id*.)  Passeretti testified that he supplemented

his memory by performing searches on Google.  (Passeretti Dep. at 63-65.)  Mortimer,

who later joined AP Supply, testified that he was able to recall contact information for

many of his former accounts at Harley.  (Mortimer Dep. at 31-32.)  Like Passeretti,

Mortimer also testified that he supplemented his memory with information gathered

through Google searches.  (*Id*.)  In June 2010, AP Supply began calling automobile

dealerships in Canada by searching for potential customers on www.yellowpages.ca.  (AP

Supply Dep. at 149-50.)  Additionally, AP Supply purchased pre-printed note cards from

Infogroup containing the names, phone numbers, and addresses of dealerships.  (*Id*.;

Bisanz Aff. ¶ 15, Ex. N.)

In February 2011, AP Supply moved its operations to Osceola, Wisconsin, which

was closer to Anderson's and Passeretti's homes in Minnesota.  (AP Supply Dep.

at 59-60.)  AP Supply's location in Osceola is 37 miles away from Harley's Oakdale

facility.  (*Id.* at 59.)  Defendants testified that, to the best of their knowledge, they began

business in Osceola in February 2011, however, telephone records indicate AP Supply

made calls of an unspecified nature from the Osceola office in late January 2011.  (Doc.

No. 38 at 13.)

## VI.    AP Supply's Alleged Use of Harley's Customer List

Harley asserts that AP Supply's success in the industry is largely owed to its use

of Harley's customer lists that were reproduced and transmitted to AP Supply through

various means and used as contacts for AP Supply's telemarketing efforts.  For example,

former Harley employees testified that, while working at Harley, Mortimer discovered a

way to view Harley's entire customer database and that he had shared that method with

other employees.  (Bisanz Aff. ¶ 6, Ex. E ("Benedict Dep.") at 66-67; Halvarson Dep. at

88.)[4]  One former Harley employee, Mike Steiner, testified that he personally took cell

phone images of Harley's customer list and delivered the images to AP Supply.  (Gallia

Decl. ¶ 4, Ex. C ("Steiner Dep.") at 53.)  Steiner also testified that, upon his delivery of

the images to AP Supply, Passeretti told Steiner, "That's nothing . . . I already have that."

(*Id.* at 54.)  Former Harley employees who left to work for AP Supply also testified that

Harley's customer information was given to AP Supply sales representatives for the

---

[4]      Benedict's testimony is that Mortimer "accidentally" accessed additional
documents.  (Benedict Dep. at 66-68.)  Mortimer denied that he accessed the documents.
(Mortimer Dep. at 54-55.)

purpose of soliciting business. (*Id.* at 48-49; Benedict Dep. at 65-66 (handwritten list); Bisanz Aff. ¶ 7, Ex. F ("Halvarson Dep.") at 76-77.)[5]

In April 2011, Jim Harley was contacted by the owner of a competing automobile parts wholesaler, Jeremy Lindman, who had recently hired a former AP Supply employee. (Harley Dep. at 86-87.) According to Lindman, the former employee brought a list of customers that the employee claimed Passeretti had provided him while working at AP Supply. (*Id.*) On request, Lindman sent Jim Harley a phone picture message of part of the list, and Jim Harley identified the image as a portion of Harley's customer database.[6] (*Id.*)

In January 2012, a Harley sales representative named Greg Richie forwarded to Jim Harley a portion of a text-message conversation between Richie and Passeretti, which read:

> Hey Richie it's Passeretti. Mi[k]e [Steiner] is probably rocking cause [*sic*] he can see all your accounts. He had Harley's accounts on video tape on his phone. Something about going into contacts and emailing someone. And it pulls up accounts.

---

[5]     Defendants dispute this testimony. When asked how he knew that the customer information was Harley's, Steiner testified that the information on the list was in the same format as the list at Harley. (Steiner Dep. at 50.)

[6]     The portion of the list submitted purports to show computer screenshots within Harley's customer database. (Bongiovanni Dep. at 133.) This evidence appears to have foundational problems, and much of the related testimony appears to be hearsay. Even so, the Court notes that the list does not contain any printed information about the customers other than an account number, the first and last name of a contact, and the company. (Gallia Decl. ¶ 32, Ex. EE.)

(Gallia Decl. ¶ 33, Ex. FF.)[7]

In response to learning that employees may have discovered a way to access Harley's full customer list, Harley made modifications to its software to prevent future unwanted access. (Bongiovanni Decl. ¶ 9.) Harley states that the overall expense of identifying how employees were able to see the full customer list and modifying the software to prevent future occurrences was over $15,000. (*Id*.)

According to Harley's expert witness, at least 796 of AP Supply's 1,522 U.S.-based customers during the first two years of AP Supply's business had previously purchased parts from Harley. (Gallia Decl. ¶ 24, Ex. W ("McClosky Suppl. Expert Report") at 14-15.) Purchases from these customers generated $4.9 million in sales revenue for AP Supply. (*Id*.) Harley's expert witness estimated that Harley lost sales in the amount of $3,361,322 as a result. (*Id*. at 18.)

## VII.   Harley's Lawsuit

AP Supply filed the present Complaint on May 7, 2012. (Compl.) In the Complaint, AP Supply asserts eleven counts: (1) Violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C); (2) Violation of the CFAA, 18 U.S.C. §1030(a)(4); (3) Misappropriation of Trade Secrets under the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. § 325C.01, *et seq.*; (4) Violation of the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D. 44; (5) Tortious Interference with Prospective Economic Advantage; (6) Civil Conspiracy; (7) Unjust

---

[7]      The Court notes that Steiner is not a defendant in this action.

Enrichment; (8) Breach of Contract – Section 7 of the Employment Agreements;

(9) Breach of Contract – Section 8 of the Employment Agreements; (10) Breach of

Contract – Section 9 of the Employment Agreements; (11) Breach of the Duty of

Loyalty.  (Compl. ¶¶ 36-115.)  Defendants move for summary judgment on all claims.

## DISCUSSION

### I.   Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

Court must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank*

*of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated,

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d

at 747.  The nonmoving party must demonstrate the existence of specific facts in the

record that create a genuine issue for trial.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957

(8th Cir. 1995).  A party opposing a properly supported motion for summary judgment

"may not rest upon the mere allegations or denials of his pleading, but must set forth

specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     CFAA

In Counts One and Two of its Complaint, Harley asserts, respectively, claims under § 1030(a)(2)(C) and § 1030(a)(4) of the CFAA.  The CFAA forbids any person "knowingly and with intent to defraud" to "access[ ] a protected computer without authorization, or exceed[ ] authorized access, and by means of such conduct further[ ] the intended fraud and obtain[ ] anything of value . . . ."  18 U.S.C. § 1030(a)(4).  The CFAA also forbids any person to "intentionally access[ ] a computer without authorization or exceed[ ] authorized access" and obtain "information from any protected computer."  18 U.S.C. § 1030(a)(2)(C).  The CFAA is primarily a criminal statute, but it provides a civil remedy to those who are injured by a violation of the statute.  *See* 18 U.S.C. § 1030(g).

Defendants move for summary judgment on Harley's CFAA claims on three grounds:  (1) courts do not recognize claims for violations of subsections (a)(2) and (a)(4); (2) Harley has not offered evidence of "loss" within the meaning of the statute; and (3) Harley has not offered evidence that Defendants exceeded their authorized access to Harley's computer system.

The parties dispute whether a civil action can be brought under subsections (a)(2) and (a)(4).  Courts in this district have determined that "[a] party cannot bring a civil action [under the CFAA] based on provisions other than § 1030(a)(5)."  *Hot Stuff Foods, LLC v. Dornbach*, 726 F. Supp. 2d 1038, 1045 (D. Minn. 2010) (citing *Cenveo Corp. v. CelumSolutions Software GMBH & Co. KG*, 504 F. Supp. 2d 574, 580 (D. Minn. 2007);

*see also McLean v. Mortg. One & Fin. Corp.*, Civ. No. 04-1158, 2004 WL 898440, at *2

(D. Minn. Apr. 9, 2004).  Harley cites to the Court's decision in *Czech v. Wall Street On*

*Demand, Inc.*, 674 F. Supp. 2d 1102 (D. Minn. 2009), and in particular to the Court's

observation that "to bring a civil action under the CFAA, a plaintiff must show a

violation of one of the CFAA's substantive provisions, as set forth in § 1030(a), and also

establish that such 'conduct involves 1 of the factors set forth in subclauses (I), (II), (III),

(IV) or (V) of subsection (c)(4)(A)(i).'"  *Czech*, 674 F. Supp. 2d 1102 (citing 18 U.S.C.

§1030(g)).  Harley points out that, in *Czech*, the plaintiff asserted CFAA claims under

subsections (a)(2) and (a)(5) and that the Court, on the defendant's motion to dismiss,

considered the plaintiff's allegations under subsection (a)(2).  *Id*. at 1107, 1112, 1114.

The Eighth Circuit has not addressed the issue of whether the CFAA authorizes a

civil action for violation of subsections (a)(2) and (a)(4).  *See, e.g.*, *Hot Stuff Foods*, 726

F. Supp. 2d at 1045.  The Court, here, need not address the issue because, even assuming

a civil action can be brought under subsections (a)(2) and (a)(4), Harley's claims fail as a

matter of law.

Subsection 1030(g) provides:

> Any person who suffers damage or loss by reason of a violation of this
> section may maintain a civil action against the violator to obtain
> compensatory damages and injunctive relief or other equitable relief.  A
> civil action for a violation of this section may be brought only if the
> conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV),
> or (V) of subsection (c)(4)(A)(i) . . . .

18 U.S.C. § 1030(g).  The term "loss" under the CFAA means:

> any reasonable cost to any victim, including the cost of responding to an
> offense, conducting a damage assessment, and restoring the data, program,
> system, or information to its condition prior to the offense, and any revenue

13

lost, cost incurred, or other consequential damages incurred because of interruption of service . . . .

18 U.S.C. § 1030(e)(11).  The weight of relevant authority restricts the CFAA "loss" requirement to actual computer impairment.  *See, e.g.*, *ReMedPar, Inc. v. AllParts Med., LLC*, 683 F. Supp. 2d 605, 614-15 (M.D. Tenn. 2010) ("investigation" of alleged wrongful acts and costs incurred not "loss" under CFAA; injuries associated with the misappropriation of confidential information not "loss" under CFAA); *Von Holdt v. A-1Tool Corp.*, 714 F. Supp. 2d 863, 875-76 (N.D. Ill. 2010) (noting that the purpose of the CFAA is to punish those who destroy data, not to cover a former employee who "walks off with confidential information"); *Am. Fam. Mut. Ins. Co. v. Rickman*, 554 F. Supp. 2d 766, 772 (N.D. Ohio 2008) ("The CFAA does not contemplate consequential damages . . . that are unrelated to harm to the computer itself."); *Civic Ctr. Motors, Ltd. v. Mason St. Import Cars, Ltd.*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005) ("[C]osts not related to computer impairment or computer damages are not compensable under the CFAA.").

Here, Harley has not demonstrated any impairment to its computer systems or any interruption in service.  While Harley does submit that it had to expend resources to analyze its system so as to discover how information was accessed, there is no evidence that Defendants did anything that impaired Harley's computer system or interrupted its computer service.  Instead, Harley's claimed injuries relate to Defendants' use of Harley's customer information.  This loss is not cognizable under the CFAA.  Accordingly, Defendants are entitled to summary judgment on Harley's CFAA claims, and Counts One and Two are properly dismissed.

### III.   MUTSA

In Count Three of its Complaint, Harley brings a MUTSA claim.  To prevail on this claim, Harley must show the existence of a trade secret and Defendants' improper acquisition, disclosure, or use of the same.  *See* Minn. Stat. § 325C.01 subd. 3. *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897 (Minn. 1983); *see also Arizant Holdings, Inc. v. Gust*, 668 F. Supp. 2d 1194, 1203 (D. Minn. 2009). Defendants argue that this claim should be dismissed because Harley has not demonstrated the existence of a trade secret.

A trade secret is information that must:  (1) not be generally known or readily ascertainable; (2) derive independent economic value from its secrecy; and (3) be the subject of reasonable efforts to maintain its secrecy.  *See* Minn. Stat. § 325C.01 subd. 5; *Electro-Craft Corp.*, 332 N.W.2d at 899.  Here, Harley maintains that its customer information constitutes a trade secret, arguing that its customer database contains commercially valuable information that is not readily ascertainable.  Harley submits that the customer information from its database identifies specific dealerships that have purchased wholesale parts and supplies from Harley and the contact and personal information compiled by Harley on those dealerships.  Harley further submits that this information will not be revealed in a simple search of the internet or Yellow Pages because automobile manufacturers expressly dissuade their dealers from purchasing parts from wholesalers.  Harley also argues that the speed at which Defendants were able to enter the market successfully demonstrates the value of its customer information.  In addition, Harley submits evidence that it takes steps to maintain the secrecy of its

customer information:  for example, by password-protecting its customer database; by

preventing its representatives from printing any portion of the list; and, by verbally

discouraging sales representatives from discussing the identities of their customers.

      Generally known principles in the industry cannot be considered trade secrets and

are not entitled to protection.  *See Guy Carpenter & Co., Inc. v. John B. Collins &*

*Assocs., Inc.*, Civ. No. 05-1623, 2006 WL 2502232, at *2 (D. Minn. Aug. 29, 2006)

(citing *I-Sys., Inc. v. Softwares, Inc.*, Civ. No. 21951, 2005 WL 1430323, at *5 (D. Minn.

Mar. 7, 2005)).  "Similarly, information that is readily ascertainable by proper means, or

information that comprises general skills and knowledge acquired in the course of

employment, do not constitute trade secrets."  *Id.* (citing *Lasermaster Corp. v. Sentinel*

*Imaging*, 931 F. Supp. 628, 637 (D. Minn. 1996)).  In Minnesota, customer lists have

generally not been considered to be trade secrets.  *See, e.g.*, *Blackburn, Nickels & Smith,*

*Inc. v. Erickson*, 366 N.W.2d 640, 645 (Minn. Ct. App. 1985); *Lasermaster Corp.*, 931 F.

Supp. at 637-38 (holding a customer list, which included contact information for each

customer, did not constitute a trade secret); *NewLeaf Designs, LLC v. BestBins Corp.*,

168 F. Supp. 2d 1039, 1043-44 (D. Minn. 2001) (citing *Lasermaster* and holding that

plaintiff's assertion that customer list was a trade secret failed at preliminary injunction

stage).  *Cf. Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 682 (D. Minn. 1986)

(holding that identity of ophthalmologists who were high volume implanters was

protectable as trade secret; considering testimony demonstrating that the identity of this

category of ophthalmologists is considered confidential in the industry and not readily

accessible to others).

Upon review of the record, the Court concludes that, as a matter of law, Harley's customer list does not constitute a trade secret. The information that Harley seeks to protect consists of a list of car dealerships, account numbers, addresses, telephone numbers, and sometimes the name of a contact person. While Harley alleges that the list contains "personal information compiled by" Harley, the allegation is not supported by the record. The evidence in the record does not establish that the list contains any particulars with regard to a dealership's purchasing history, its product needs, or any other account specific information. Even if it did contain some personal information, Harley has failed to proffer evidence that any information on the list is proprietary or confidential. Instead, the type of information contained in the list is readily ascertainable by proper means within the trade. Indeed, the record establishes that Harley purchases information on car dealerships from InfoUSA, a publicly available source. In addition, there is evidence that Harley's employees used the internet to find information on car dealerships. Defendants' use of readily ascertainable industry contacts does not suggest the misappropriation of a trade secret. Accordingly, Harley's trade secret claim fails as a matter of law and Count Three is properly dismissed.[8]

---

[8]   While Defendants' tactic of calling former Harley customers to solicit business for AP Supply may seem objectionable, the Court notes that "[w]ithout a proven trade secret there can be no action for misappropriation, even if defendants' actions were wrongful." *Electro-Craft*, 332 N.W.2d at 897. *See also Blackburn*, 366 N.W.2d at 645 ("[T]he solicitation of former customers might seem unfair and unjust, but the employer has no exclusive right to the continued patronage of customers, and employees have the right to better themselves with new businesses."). Here, both Harley and AP Supply are national telemarketers who make a significant number of cold-calls to generate business. The sales representatives for both Harley and AP Supply can do their jobs without extensive

(Footnote Continued on Next Page)

## IV.   MDTPA

In Count Four of the Complaint, Harley alleges that Defendants violated the MDTPA.  In particular, Harley asserts that Defendants use identical part numbers for several of the automotive parts and supplies offered for sale by AP Supply so as to cause a likelihood of confusion as to the source of the parts and supplies.  (Compl. ¶¶ 63-67.)

The MDTPA entitles any person "likely to be damaged by a deceptive trade practice" to injunctive relief, irrespective of the existence of actual monetary damages or deceptive intent.  Minn. Stat. § 325D.45, subd. 1.  Among other deceptive trade practices, the statute entitles a claimant to relief when a person "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."  Minn. Stat. § 325D.44, subd. 1(9) & (13).  Injunctive relief is the MDTPA's sole remedy and it is available only "to a person likely to be damaged" by a deceptive trade practice in the future.  *See* Minn. Stat. § 325D.45, subd. 1.

The record establishes that AP Supply and Harley both include the manufacturer's part number to identify the retail analog for their respective wholesale parts.  (Passeretti Dep. at 100-101; Bisanz Aff. ¶ 17, Ex. P.)  To distinguish between particular vehicle manufacturers, Harley assigns a one-digit prefix.  (Bongiovanni Dep. at 77-81.)  AP

---

(Footnote Continued From Previous Page)

training or industry experience.  There is also evidence that sales representatives in this industry are mobile and it is common for representatives to attempt to strike out on their own.  Finally, the Court notes that the Employee Agreements did not contain a non-solicitation clause, an agreement by the Individual Defendants not to solicit Harley customers for a period of time after termination of employment.

Supply distinguishes between manufacturers by using an abbreviation for the manufacturer, such as "GEN" for General Motors.  (Passeretti Dep. at 100-101.)

The Court discerns nothing deceptive about the use of the actual manufacturer's part number, along with an additional abbreviation to identify the particular manufacturer of the part.  As such, Count Four is properly dismissed.

## V.     Breach of Contract

In Counts Eight, Nine, and Ten of its Complaint, Harley alleges that Defendants breached, respectively, Sections 7, 8, and 9, of their Employment Agreements with Harley.  To prevail on a claim for breach of contract in Minnesota, a plaintiff must prove "(1) formation of a contract; (2) performance by [plaintiff] of any conditions precedent; (3) a material breach of the contract by [the defendants]; and (4) damages."  *MSK Eyes Ltd. v. Wells Fargo Bank, Nat. Ass'n*, 546 F.3d 533, 540 (8th Cir. 2008); *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000).

Under Minnesota common law, restrictive covenants "are enforceable if they serve a legitimate employer interest and are not broader than necessary to protect this interest." *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn. 1998).  Restrictive covenants are "looked upon with disfavor, cautiously considered, and carefully scrutinized."  *Id.* (citation omitted).  The Court analyzes a restrictive covenant by "balanc[ing] the employer's interest in protection from unfair competition against the employee's right to earn a livelihood."  *Id.*  In addition, "[t]he covenant must also be reasonable under all the circumstances."  *Prow v. Medtronic, Inc.*, 770 F.2d 117, 120 (8th Cir. 1985) (citing *Cherne Indus. v. Grounds & Assoc.*, 278 N.W.2d 81, 88 (Minn. 1979)).  To determine the

reasonableness of a non-compete agreement, the Court considers:  (1) whether the restraint is necessary for the protection of the business or goodwill of the employer; (2) whether the restraint is greater than necessary to adequately protect the employer's legitimate interests; (3) how long the restriction lasts; and (4) the geographic scope of the restriction.  *Prow*, 770 F.2d at 120.

Harley alleges that Defendants sold and solicited the sale of automotive parts in violation of Section 8 of the Employment Agreements.  In addition, Harley asserts that Defendants used Harley's confidential customer information in violation of Sections 7 and 9 of the Employment Agreements.

## A.    Section 8

Section 8 of the Employment Agreement provides:

> For a period of twelve (12) months following the termination of Employee's employment hereunder, Employee shall not, either directly or indirectly, solicit the sale of, arrange for the distribution of, sell, or distribute automobile parts from a location within a 300 mile radius of either [Harley's Oakdale, Minnesota or Ft. Myers, Florida locations].

(Employment Agreements § 8.)

As an initial matter, the parties dispute the validity of the non-compete restriction in the Employment Agreement.  Harley argues that it has a legitimate interest in protecting its trade secrets (confidential customer information) and that its restrictive covenant is narrowly drafted and serves to protect its interests.  Defendants argue that the geographical restriction in Section 8 is not enforceable.

The Court determines that the one-year, 300-mile non-compete restriction is void because it is unreasonable and serves no legitimate business interest.  Time and territorial

restrictions are to be looked at with regard to the nature and character of the employment. *Prow*, 770 F.2d at 120. Harley and AP Supply both operate telemarketing businesses that call contacts throughout both the United States and Canada. AP Supply is not prohibited from soliciting customers who are located within the 300-mile radius; it is only prohibited from placing calls from a physical location within the 300-mile radius. Given the nature of their national telemarketing business, it is of no consequence as to where the calls originate. Requiring, through the non-compete, former employees to move outside an arbitrary 300-mile radius to place calls that could be made from anywhere is unreasonable and serves no legitimate business purpose.[9] Thus, the 300-mile radius restriction is void as a matter of public policy, and Individual Defendants did not breach their employment contracts to the extent that they may have worked for AP Supply within 300-miles of Harley's Oakdale location.[10] Count Nine is properly dismissed.

**B.    Section 7**

Section 7 of the Employment Agreement reads:

> Employee shall not at any time during his/her employment under this Agreement, except in the normal course of Employer's business, or after termination of that employment, disclose to any person or organization information regarding Employer's customers, or the procedures and systems utilized by Employer to service Employer's customers which the

---

[9]    Harley argues that it has identified that its customer list is a protectable trade secret, and therefore it has a legitimate business purpose for including a restrictive covenant in the Employment Agreements. For the reasons discussed above, the Court determined that Harley failed to establish that its customer list constitutes a protectable trade secret.

[10]    For the same reason, Defendants Anderson and Passeretti did not breach their employment contracts by operating Big Rig Supply within the 300-mile radius.

> Employee acquired knowledge of during his/her employment with
> Employer.

(Employment Agreements  § 7.)  This purpose of Section 7 appears to be to prevent

employees and former employees from disclosing confidential information.  Harley

asserts that Defendants violated Section 7 by misappropriating and using Harley's

confidential customer information.  Defendants assert that they did not take or use any

confidential information.

At the core of Harley's claim that Defendants violated Section 7 is the assertion

that its customer list contains confidential information.  However, as discussed above, the

list of Harley's customers does not constitute a trade secret and is not otherwise

confidential.  Instead, the information consists of a list of dealerships and other basic

information, such as addresses and telephone numbers, which is readily ascertainable in

the industry.  The Court notes that Harley could have limited its former employees'

contact with Harley's customers through a narrowly drawn, valid and enforceable

covenant non-compete or non-solicitation agreement.  *See, e.g., Softchoice Corp. v.

MacKenzie*, 636 F. Supp. 2d 927, 940 (D. Neb. 2009).  As noted above, the non-compete

provision in the Employment Agreement is not valid and enforceable.  Moreover, there is

no provision in the Employment Agreements that prohibits the solicitation of Harley

customers for a reasonable period of time after the termination of employment.[11]  Thus,

---

[11]      Section 7 of the Employment Agreements does vaguely prohibit the disclosure of
information regarding Harley's customers, which the employee learned of during his
employment with Harley.  Any reliance on this section, however, to prevent the
solicitation of Harley's customers by former employees would fail.  Section 7 has no

(Footnote Continued on Next Page)

Harley cannot expect that its former employees would refrain from contacting former customers.  *See, e.g., id.*  ("Softchoice cannot achieve by way of a nondisclosure agreement what it could not have obtained via a nonsolicitation agreement.").  Because the customer information purportedly used by the Individual Defendants is generally known or publicly available, the disclosure of such information does not give rise to recoverable damages.  Thus, Count Eight is properly dismissed.

### C.    Section 9

Section 9 of the Employment Agreement provides:

> Upon termination of his employment with Employer, Employee shall deliver promptly to Employer all records, manuals, books, blank forms, documents, letters, memoranda, notebooks, notes, reports, data, tables, calculations or copies thereof, which are the property of the Employer or which relate in any way to the business, products, practices or techniques of the Employer.

(Bisanz Aff., Exs. I-K.)  Section 9 of the Employment Agreements require that the Individual Defendants return any "records, manuals, books, blank forms, documents, letters, memoranda, notebooks, notes, reports, data, tables, calculations or copies thereof" to Harley upon termination of employment.  Harley contends that Defendants did not return screen shots taken of Harley's customer lists and that Defendants possessed at least one unreturned copy of Harley's parts list.  Defendants again maintain that the testimony

---

(Footnote Continued From Previous Page)

temporal limitation, and without such a limitation, the provision could prohibit former employees from *ever* soliciting Harley's customers if they learned of those customers during their employment with Harley.  Such a restriction would not be enforceable.

upon which Harley relies to establish that Defendants took screenshots of Harley's list is inadmissible hearsay.

The Court concludes that the record evidence, while not overwhelming, is sufficient to create a fact issue as to Harley's claim that the Individual Defendants breached Section 9 of the Employment Agreement. There is evidence in the record that could lead a reasonable juror to find that the Individual Defendants took images of Harley's customer or parts lists and did not return them when they stopped working for Harley. The Court notes, however, that even if a jury were to find that the Individual Defendants breached Section 9 of the Employment Agreement, any damages would likely be minimal because the lists contain generally known or readily available information.

## VI.   Tortious Interference with Prospective Economic Advantage

In Count Five of its Complaint, Harley alleges Tortious Interference with Prospective Economic Advantage. In support, Harley asserts that Defendants wrongfully interfered with Harley's prospective sales by using its customer list to contact dealerships and offer competing parts and supplies. Specifically, Harley maintains that Defendants exceeded their authorized access to its computers and misappropriated its trade secrets.

Under Minnesota law, a cause of action for tortious interference with prospective contractual relations requires the following showing: (1) that a defendant intentionally and improperly interfered with another's prospective contractual relationship; (2) that the interference caused pecuniary harm from the loss of the relationship's benefits; and (3) that the interference either induced a third person not to enter into or continue the

prospective relation or prevented the continuance of the relationship.  *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632-33 (Minn. 1982) (quoting Restatement (Second) of Torts § 766B (1979)).

Here, both Harley and AP Supply compete in the business of wholesaling auto parts to car dealerships via a national telemarketing effort.  Both Harley and AP Supply make a significant number of cold-calls.  Harley's claim of tortious interference is based on the use of Harley's customer list, which, as discussed above, is not a protectable trade secret, and the information in the list is readily ascertainable.  In addition, Defendants were not prohibited from soliciting Harley's customers.  Due to the public and ascertainable nature of the information in the customer list, and the telemarketing business in which the parties are involved, no reasonable juror could conclude that Defendants tortiously interfered with Harley's contractual relations.

## VII.   Civil Conspiracy

In Count Six of the Complaint, Harley alleges a claim for civil conspiracy, based on the allegation that the Individual Defendants worked in combination to exceed their authorized access to Harley's computer system and the customer list contained therein, in violation of company policy, Defendants' employment contracts, and applicable law.

"Accurately speaking, there is no such thing as a civil action for conspiracy" under Minnesota law.  *Cenveo Corp. v. Southern Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1136 (D. Minn. 2011) (citing *GSS Holdings, Inc. v. Greenstein*, Civ. No. 07–1573, 2008 WL 4133384, at *2 (Minn. Ct. App. Sept. 9, 2008)).  Rather, "a civil conspiracy claim is merely a vehicle for asserting vicarious or joint and several liability, and hence such a

'claim' is dependent upon a valid underlying tort claim." *Id.* (citation omitted). "Civil conspiracy requires the conspirators to have a meeting of the minds as to plan or purpose of action to achieve a certain result." *Id.* (citation omitted).

Viewing the record in the light most favorable to Harley, there is insufficient evidence to support the claim that Defendants agreed to accomplish an unlawful purpose and took concerted actions to achieve that purpose. Accordingly, Defendants are entitled to summary judgment on Count Six.

## VIII.  Unjust Enrichment

In Count Seven, Plaintiff alleges a claim for unjust enrichment. To establish a claim for unjust enrichment under Minnesota law, a plaintiff must demonstrate "that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit." *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001). A claim for unjust enrichment does not "lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully." *First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981) (citation omitted). In addition, unjust enrichment is an equitable theory which cannot be asserted where the rights of the parties are governed by a valid contract. *See U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981). Because the Individual Defendants were parties to the Employment Agreements with Harley, Harley's claim for unjust enrichment fails as a matter of law.

## IX.   Breach of Duty of Loyalty

In Count Eleven, Harley alleges a breach of the duty of loyalty.  Under Minnesota law, employees owe a duty of loyalty to their employers.  *Marn v. Fairview Pharm. Servs., LLC*, 756 N.W.2d 117, 121 (Minn. Ct. App. 2008); *see also Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn. Ct. App. 1987) (explaining that an employee's duty of loyalty prohibits an employee from competing with the employer while still employed, but also noting that employees who wish to leave and start businesses should not be unduly hindered).  "[A]n employee breaches the duty of loyalty, and thus engages in employment misconduct, by encouraging a third party to terminate a contract between the employer and the third party [through solicitation]."  *Schmidt v. Blue Lily Farms LLC*, Civ. No. 08–1398, 2009 WL 2151135, at *2 (Minn. Ct. App. July 21, 2009).

Harley argues that Anderson and Passeretti breached their duty of loyalty to Harley when they operated Big Rig Supply while still working for Harley.  At Big Rig Supply, Anderson and Passeretti sold wholesale parts and service items to heavy truck dealers.  (AP Supply Dep. at 19-20; Halvarson Dep. at 61-62.)  While the record demonstrates that Harley's business is focused on the sale of automobile parts, Harley has submitted evidence that it purchased information on heavy truck dealers at one point.  Viewing the evidence in the light most favorable to Harley, a reasonable juror could conclude that Anderson and Passeretti competed with Harley through their operation of Big Rig Supply.  Therefore Harley's claim for breach of duty of loyalty remains.

**ORDER**

For the reasons stated above, **IT IS HEREBY ORDERED**:

1.     Defendants' Motion for Summary Judgment (Doc. No. [36]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.     Counts One, Two, Three, Four, Five, Six, Seven, Eight, and Nine of Plaintiff's Complaint (Doc. No. [1]) are **DISMISSED WITH PREJUDICE.**

      b.     Counts Ten (Breach of Contract-Section 9 of the Employment Agreement) and Eleven (Breach of Duty of Loyalty) remain for trial.

Dated:  December 23, 2013        s/Donovan W. Frank
                                     DONOVAN W. FRANK
                                     United States District Judge